**FILED**
**Apr 06, 2023**
**10:51 AM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



### TENNESSEE BUREAU OF WORKERS' COMPENSATION CLAIMS
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT NASHVILLE

| | | |
|---|---|---|
| **ANDRES HERNANDEZ,** | ) | **Docket No. 2021-06-1105** |
| **Employee,** | ) | |
| **v.** | ) | |
| | ) | |
| **SMS, INC., d/b/a Master Stucco,** | ) | **State File No. 800494-2021** |
| **Employer,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **TRAVELERS PROPERTY** | ) | **Judge Joshua Davis Baker** |
| **CASUALTY CO. OF AMERICA,** | ) | |
| **Carrier.** | ) | |

---

## EXPEDITED HEARING ORDER

---

The Court held a March 16, 2023 expedited hearing to determine Mr. Hernandez's entitlement to past and ongoing medical and temporary disability benefits for fracturing his left shoulder in a fall at work. Specifically, the issue is whether Mr. Hernandez was an employee rather than an independent contractor. For the reasons below, the Court finds he is likely to prevail at a final hearing in proving he was an employee, and Master Stucco must provide him medical benefits.

### Claim History

Mr. Hernandez traveled to Nashville from Mexico because his brother-in-law, Juvencio Rivera Vargas, told him Master Stucco needed workers. He worked on Master Stucco jobsites by handing tools and materials to co-employees, cleaning up, and performing other unskilled labor.

Master Stucco's owner, Glen Cruzen, testified that he first met Mr. Hernandez when visiting a jobsite, which he did almost daily. Mr. Cruzen recalled, "So, when I went by to check on the job, [Mr. Rivera] said, 'I would like for him to work with us.' That's how I met him and how he joined us."

Mr. Hernandez lived with Mr. Rivera and another Master Stucco employee in a home that they rented from Mr. Cruzen. The three men rode together to Master Stucco's jobsites. Another worker named Jose, whose last name Mr. Hernandez did not know, lived next door to the men in a separate home on the same property. Jose delivered materials to jobsites and acted as an interpreter and translator. While Mr. Hernandez said Jose was "in charge," Mr. Cruzen said Jose was "more of a courier."

On July 27, 2021, Mr. Rivera asked Mr. Hernandez to help him place "square things" on the outside of a chimney at a private residence on a Master Stucco jobsite. As Mr. Hernandez walked across a loose board of scaffolding, it gave way, and he fell from the top section of the scaffolding onto the scaffolding section below, fracturing his left shoulder.

He recalled feeling immense pain and wanting treatment but having no way to get to the hospital. After speaking with Mr. Cruzen by phone, Mr. Rivera refused to take Mr. Hernandez to a hospital or call an ambulance. He took him home instead. With his arm swollen and painful, Mr. Hernandez went next door to ask Jose for help. Jose called Mr. Cruzen but told Mr. Hernandez to manage with pain medication and wait until morning.

The next morning, Jose called Mr. Hernandez to say Mr. Cruzen's son would take him to the hospital. He also told him to report that his injury occurred at home from falling off a ladder while changing a lightbulb. He encouraged him to ignore any medical bills, saying the hospital would not collect. At the hospital, imaging revealed a left shoulder fracture.

From there, Mr. Hernandez had a hard time getting follow-up treatment, missing his first appointment because no one would drive him. As he wrote in his declaration, which was translated into English, "I didn't know anyone and I didn't have anyone to bring me, and I don't speak English[.] I was living in Glenn's house with my coworkers Juvencio and Jose Antonio, and they couldn't bring me to the hospital [without] permission[.]" Eventually, Mr. Hernandez located an organization with volunteers to drive him to doctors' appointments and help him initiate legal action. After he filed his case, Mr. Hernandez was evicted.

On August 19, Dr. Philip Elizondo estimated that Mr. Hernandez would be unable to work until November 11. He wrote, "Explained to the patient that his fracture will take a minimum of 6 weeks to heal in an arm sling. He would also need at least 6 weeks of therapy and strengthening exercises before he would be reable [sic] to return to construction work." Despite this prediction, Mr. Hernandez testified he started new employment sooner than expected, sometime between October 20-25.

Mr. Cruzen testified about his company's work, its "business model," including why he uses undocumented workers, and how he developed a release for workers to sign to acknowledge their status as independent contractors.

He explained that his company does not install stucco but instead repairs a wide variety of materials that intersect with stucco and damage it, like roof flashings, window caulking, or failed windowsills. Because it's a "messy business" and skilled labor is expensive to use for simple clean-up, the company has "brought in companies who only clean up jobsites." However, Mr. Cruzen said, "Sometimes it's easier to also have people who can do that for us, if it's small, 'in house.'"

Mr. Cruzen said his business model has adapted over thirty years because immigrant labor has "dramatically changed" the construction industry. For example, he said that "laws . . . prevent construction owners from hiring undocumented workers yet [allow] immigrants in to compete." Also, "young kids in our society don't want to work in construction. They have this dream of working at Google and playing video games and getting paid a hundred thousand a year."

From Mr. Cruzen's perspective, his hiring choices are "ex-convicts, people who have judgments against them, people behind in child support, as well as immigrants who are not legal to work here. Sad to say: that's all that's available." He hires undocumented immigrants because his clients have "above average income" and many valuables. He explained, "Sometimes we have access to the inside of their home. . . . Therefore, I need people who can be trusted." So, he added, "We have found that the law does not punish us if we use independent contractors."

He created a "pay arrangement" to keep his company competitive but protected. He asked his workers to sign a "Payment & Lien Release" to receive pay, giving them a week to review the release. Afterward, employees signed the below when receiving their paychecks:

I, Andres Hernandez, acknowledge receipt of the amount listed above as payment in full for stucco repair services provided to Master Stucco by myself and my crew.

I work as an independent contractor for Master Stucco and understand that no taxes have been withheld from this amount. I understand that I am responsible for paying any taxes that may be due. As an independent contractor, I provide my own tools, my own vehicle, set my own hours, pay the men who work for me out of the above pay, and provide construction services to other customers.

_____

Andres Hernandez

Mr. Hernandez testified he did not understand the release, knew he needed to sign it to receive pay, and simply dared not ask questions. He testified, "I did not come here to ask questions; I came here to work." His Spanish is not the best, according to his declaration, nor does he speak or understand English. He testified that the release he signed has been explained since he signed it, but he is still not sure he understands it. Further, he did not comprehend the significance of a 1099 form. He stated that he does not know whether he received a 1099 or what he would have done with it if he had.

Before coming to Tennessee, Mr. Hernandez worked in Mexico, cleaning homes, washing cars, and working in fields. He did not know the Spanish word for "stucco," only recognizing the word's meaning when the interpreter showed him images on her phone. From his perspective, asking questions was futile, as he lacked the resources necessary to negotiate anything other than what Mr. Cruzen was willing to extend.

Jose Antonio Baptista, who worked with Mr. Hernandez and still works for Mr. Cruzen, testified that he used Google Translate to read the release in Spanish, understood it, and willingly signed the statements to receive his pay. He said he considers himself an independent contractor, but he also referred to the releases as "proof of payment." He and Mr. Rivera used their own tools, and he said he only works for Master Stucco.

Both parties testified regarding Mr. Cruzen's control over the work his company performs. Mr. Cruzen testified, "Almost every day I go to every job" to examine the work. Mr. Hernandez testified that Mr. Rivera would send Mr. Cruzen pictures of their work at the end of every workday. And Mr. Cruzen acknowledged, "I have an attention to detail that drives people insane, but that is why people hire me to do the work."

About Mr. Hernandez's hiring, he said he told Mr. Rivera, "'If you like him, that's fine.'" But usually, he said, "I would ask what kind of experience they have because we prefer people with construction experience," as anyone else "may not like inconsistent timelines when we cannot work." He continued, "Those are the kind of people I want, is someone who will be there, because if they don't show up, it affects me . . . After fifty-one years, you kind of know what you want to find." And now that he has implemented the releases for a worker to receive pay, he said he "explain[s] to the worker the pay arrangement before they even start."

### Findings of Fact and Conclusions of Law

Mr. Hernandez must present sufficient evidence to demonstrate that he would likely prevail at a final hearing. Tenn. Code Ann. § 50-6-239(d)(1) (2022); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Mar. 27, 2015).

Concerning the status of Mr. Hernandez's work relationship with Master Stucco, the Workers' Compensation Law defines "employee" to include "every person . . . in the

service of an employer . . . under any contract of hire or apprenticeship, written or implied[.]" Tenn. Code Ann. § 50-6-102(10)(A). An employee does not, however, include an "independent contractor" or "subcontractor." *Id.* at § 50-6-102(10)(D)(i).

Whether the worker is an employee or subcontractor depends on the nature of the business, the way it is conducted, and the worker's relationship to that business. *Seals v. Zollo*, 327 S.W.2d 41 (Tenn. 1959). When in question, the worker claiming an employment relationship exists bears the burden of proof, to be determined by considering the following factors:

(a) The right to control the conduct of the work,
(b) The right of termination,
(c) The method of payment,
(d) The freedom to select and hire helpers,
(e) The furnishing of tools and equipment
(f) Self-scheduling of work hours,
(g) The freedom to offer services to other entities[.]

*Id*. at § 50-6-102(10)(D)(i).

Notably, it is "the duty [of courts] to determine if the worker is an employee or independent contractor, and the employer cannot use a contract to take that responsibility from the court." *Smith v. Beazer Homes*, No. W2005-01114-SC-WCM-CV, 2006 Tenn. LEXIS 687, at *6 (Tenn. Workers' Comp. Panel Aug. 23, 2006). Under Workers' Compensation Law, "[n]o contract or agreement, written or implied, or rule, regulation or other device, shall in any manner operate to relieve any employer, in whole or in part, of any obligation created by this chapter[.]" Tenn. Code Ann. § 50-6-114(a). Therefore, the signed releases from employees purporting to acknowledge independent contractor status carry no weight in this analysis.

Rather, the Court must view the evidence presented through the lens of the seven factors listed in the statute and case cited above. The Court applies each factor to determine – not what Mr. Hernandez agreed to be called – but the actual working relationship between him and Master Stucco.

The picture that emerged from testimony was not that of an independent contractor who possessed *control*, *rights*, *independence*, or *freedom*, which are all words in the applicable statutory and case-law factors. In contrast, the employer here controlled housing, transportation, "pay arrangement," hours, work conduct and performance, as well as hiring and firing. Mr. Hernandez testified that he witnessed two workers, including his own brother-in-law, ask permission to get him medical treatment, which demonstrates the control Mr. Cruzen exercised over his workforce and jobsites.

As for factor *a*, Mr. Cruzen used his expertise and attention to detail to control work-quality, visiting jobsites and obtaining photographs at workdays' end. With fifty-one years of experience, he could expertly perform the work the men were doing and used that knowledge and experience to oversee their work.

Concerning factors *b*, *c*, and *d*, Mr. Cruzen clearly articulated his control over hiring and firing, saying that his company's reputation could not risk hiring someone he deems dishonest or irresponsible, like a felon or an absentee parent with a judgment, as he cannot risk theft from his clients. He also made decisions concerning pay method, paying the men individually and insisting on their signature on a document calling themselves independent contractors in exchange for employment.

Additionally, he exerted control over his workforce as a landlord, which affects factors *f* and *g*. While, in theory, the men could work elsewhere, they did not. Mr. Cruzen said his company benefitted from having employees close at hand and "in-house." As he said, the company needs "someone who will be there, because if they don't show up, it affects [him]." Further, Mr. Hernandez could not control his work hours, as Master Stucco employees controlled his transportation. He worked when his co-workers at Master Stucco worked. Similarly, he went to the hospital only when they or Mr. Cruzen's son decided to take him.

Factor *e* is of little relevance here because Mr. Hernandez needed no specialized tools or equipment, since he worked only as a helper. His lack of specialized training appeared evident, as he called some material "square things" and did not know *stucco* or its equivalent Spanish word.

Given these factors, the Court finds Mr. Hernandez is likely to prevail in proving his status as an employee for Master Stucco rather than an independent contractor. Therefore, Master Stucco must "furnish, free of charge to the employee, such medical and surgical treatment . . . made reasonably necessary by accident[.]" Tenn. Code Ann. § 50-6-204(a)(1)(A).

Mr. Hernandez fractured his left shoulder, an injury that required medical treatment, while working for Master Stucco. Therefore, Master Stucco would likely be required to pay for his past medical treatment for this work injury at a final hearing. *See Ducros v. Metro Roofing and Metal Supply Co., Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 62, at *10 (Oct. 17, 2017) ("[A]n employer who does not timely provide a panel of physicians risks being required to pay for treatment an injured worker receives on his own.").

Further, an employee who becomes disabled from working due to a workplace injury that prevents him from working for a specific period is entitled to compensation. *Jones v. Crencor Leasing and Sales*, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Dec. 11, 2015). Dr. Elizondo wrote that Mr. Hernandez's work injury would disable him from

working for twelve weeks. Mr. Hernandez testified he returned to work earlier than expected, after about ten weeks. So, he is due temporary total disability benefits for that period. Tenn. Code Ann. § 50-6-207(1).

However, even though Mr. Hernandez is likely to prove his entitlement to temporary disability and past medical expenses at a final hearing, the Court cannot award those benefits without admissible proof of his wages and medical bills.

Therefore, the Court must deny his request for temporary disability benefits and past medical expenses at this time. If Mr. Hernandez files a motion with admissible proof supporting an award of those benefits, the Court will grant an award at that time.

**It is ORDERED** as follows:

1.  Master Stucco shall provide Mr. Hernandez with reasonable and necessary medical treatment for the work-related shoulder injury with Dr. Philip Elizondo as the authorized treating physician.

2.  Mr. Hernandez's request for temporary disability benefits and past medical expenses is denied at this time.

3.  This case is set for a status hearing on **June 19, 2023, at 9:00 a.m. Central Time.** The parties must call 615-741-2113 or 855-874-0474.

4.  Unless interlocutory appeal of this Expedited Hearing Order is filed, compliance with this Order must occur by seven business days of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance by email to WCCompliance.Program@tn.gov by the compliance deadline. Failure to do so may result in a penalty assessment for non-compliance. For compliance questions, please contact the Workers' Compensation Compliance Unit by email at WCCompliance.Program@tn.gov.

**ENTERED April 6, 2023.**

_____
**Joshua Davis Baker, Judge**
**Court of Workers' Compensation Claims**

Exhibits

1. Medical Records
2. Rule 72 Declaration of Andres Hernandez
3. Master Stucco Payment and Lien Releases, collective exhibit

Technical Record

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Motion to Continue
5. Order Granting Motion to Continue
6. Motion for Sanctions
7. Order Granting Motion for Sanctions
8. Order Setting Expedited Hearing
9. Employer's Prehearing Statement

## **CERTIFICATE OF SERVICE**

I certify that a copy of this Order was sent as indicated on April 6, 2023.

| Name | Certified Mail | Fax | Email | Service sent to: |
|---|---|---|---|---|
| Andres Hernandez, Employee | | | X | Andres.hernandez.hernandez1973@gmail.com |
| Ritchie Pigue, Employer's Attorney | | | X | rpigue@tpmblaw.com mwatson@tpmblaw.com dsmith@tpmblaw.com |

_____

**Penny Shrum, Court Clerk**
**Court of Workers' Compensation Claims**
wc.courtclerk@tn.gov



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____

*[Signature of appellant or attorney for appellant]*